(97 South. 272)

Nos. 25241, 25106.

## NATIONAL PARK BANK v. CONCORDIA LAND & TIMBER CO. (BLACK RIVER LUMBER CO., Garnishee).

## BLACK RIVER LUMBER CO. v. NATIONAL PARK BANK.

(July 17, 1922. Rehearing Denied April 2, 1923.)

*(Syllabus by Editorial Staff.)*

1. **Garnishment** &#9758;124—Garnishee could attack judgment on ground that proceedings in rem as conducted were unauthorized.

If the law did not authorize proceeding in rem against a foreign corporation as conducted through appointment of curator ad hoc and by posting copies of the petition, citation, and writ of attachment, the judgment was absolutely null and void, and garnishee could attack it on that ground.

2. **Garnishment** &#9758;196 — Judgment falls if judgment against principal defendant null and void.

As demand against garnishee is purely ancillary to that against defendant, if judgment against defendant is null and void, because proceeding in rem as conducted was not authorized, judgment against garnishee falls with it.

3. **Attachment** &#9758;209(½)—Service in attachment proceeding made by posting copy of citation and attachment.

In proceedings in rem by attachment against absent or nonresident defendant, defendant is cited under Code Prac. arts. 254, 255, by posting copy of citation and attachment, and copy of petition alone is delivered to curator ad hoc, or advocate, if absentee fails to appear.

4. **Attachment** &#9758;209(½)—Statutes sufficiently complied with by posting copies of attachment, citation, and petition at courthouse door.

Code Prac. arts. 254, 255, providing for service of attachment and citation on absent or nonresident defendant by posting at courthouse door, and requiring sheriff to keep copy of petition for delivery to defendant or advocate appointed to defend him, were sufficiently complied with by posting copy of petition, as well as attachment and citation.

5. **Corporations** &#9758;641—Statute authorizing proceeding in rem by posting and appointment of curator ad hoc not repealed.

Act No. 267 of 1914, § 26, relative to service on foreign corporations as originally enacted or as modified by Act No. 179 of 1918, is not in conflict with, and did not repeal as to corporations which have withdrawn permanently from the state, Code Prac. arts. 254, 255, 260, relative to proceedings in rem by posting attachment and citation and appointment of curator ad hoc, especially in view of section 3 of Act No. 179 of 1918.

6. **Corporations** &#9758;668(9)—Statute providing for service on secretary of state inapplicable to corporations which have withdrawn permanently from the state.

As Act No. 267 of 1914, § 26, subsec. c, providing for service on secretary of state when foreign corporation has not appointed

agent, or he cannot be found, applies only to corporation required by law to appoint and maintain agent, it does not apply to corporation which has withdrawn permanently from the state.

**7. Attachment ⊛⟶115 — Allegation that corporation about to leave state did not prevent appointment of curator ad hoc under allegation of permanent absence.**

In attachment, allegation under Code Prac. art. 240, that defendant was about to leave the state permanently, did not deprive court of jurisdiction to appoint curator ad hoc under allegation that defendant was permanently absent.

**8. Appeal and error ⊛⟶934(3)—Assumed from rendition of judgment on constructive service that allegation of permanent absence from state was proved.**

When evidence offered on confirmation of default was not reduced to writing, it will be presumed from fact that court rendered judgment on constructive service that allegation of defendant's permanent absence was proved, as otherwise judgment could not be legally rendered.

**9. Evidence ⊛⟶22(2)—Judicial notice not taken that corporation proceeded against in rem had appointed agent.**

Though Act No. 179 of 1918, § 1, requires secretary of state annually to send sheriffs and clerks of court certified lists of foreign corporations that have appointed agents, the trial or Supreme Court is not required to take judicial notice that foreign corporation proceeded against in rem on appointment of curator ad hoc was maintaining authorized agent.

**10. Judgment ⊛⟶419—May be annulled by direct action when corporation maintaining agent has been proceeded against by appointment of curator ad hoc.**

If foreign corporation proceeded against in rem by appointment of curator ad hoc was maintaining agent authorized to receive service, it has adequate remedy by direct action to annul the judgment.

**11. Evidence ⊛⟶89—Presumption of continuance of agency for service of process held overcome by presumption of verity of judgment.**

Though Supreme Court in another case had held that corporate defendant had agent for service of process four years before suit was instituted, the presumption that such agency still exists is overcome by presumption of verity arising from judgment rendered on record regular on its face, and embracing petition alleging that defendant was permanently absent from the state and not represented therein.

### On Rehearing.

**12. Appeal and error ⊛⟶877(2)—Garnishee cannot attack judgment which defendant asks to be affirmed.**

Where defendant appears in appellate court, admits plaintiff's claim, and prays that judgment against it be affirmed, it will be affirmed, notwithstanding attack by garnishee.

**13. Garnishment ⊛⟶124—Garnishee's only interest in judgment against defendant is to see that it is valid.**

The garnishee has no other interest in judgment against defendant than to see that it is protected in its payment, if any, by a valid judgment against defendant.

**14. Judgment ⊛⟶461(3)—Evidence held to show failure to answer not due to carelessness or inadvertence.**

In suit to set aside judgment against garnishee, evidence held to show that understanding of garnishee's local manager that plaintiff's counsel intended to submit question of extension of time to plaintiff, in reliance on which it failed to answer before judgment, was not due to carelessness or inadvertence, but to failure of plaintiff's counsel to make it clear that he intended to take judgment and only submit the question of collection to his client.

**15. Judgment ⊛⟶427, 460(10)—Merits of action not reviewed in suit to set aside judgment.**

In action of nullity to set aside judgment, where the only prayer is that the judgment be set aside and defendant given opportunity to answer, its defense cannot be gone into, and, moreover, inquiry into correctness of the judgment cannot be had in proceeding to annul the judgment.

Appeal from Tenth Judicial District Court, Parish of Concordia; L. M. Calhoun, Judge.

Two actions by the National Park Bank against the Concordia Land & Timber Company, with garnishment against the Black River Lumber Company, and by the Black River Lumber Company against the National Park Bank. Judgment for the Bank in each case, and the Lumber Company appeals. Judgment in the first action affirmed, and

judgment in the second action annulled, avoided, and set aside.

A. B. Stratton and W. C. Kirk, both of Chicago, Ill., Dale, Young & Dale, of St. Joseph, and Merrick & Schwarz, of New Orleans, for Black River Lumber Co.

Wm. B. Grant, of New Orleans, and G. P. Bullis, of Vidalia, for National Park Bank.

By Division A, composed of PROVOSTY, C. J., and OVERTON and LECHE, JJ.

OVERTON, J. In the first named of these consolidated cases, judgment was rendered against the Concordia Land & Timber Company, a corporation organized under the laws of Wisconsin, and domiciled in said state, for the sum of $56,517.04, with interest at the rate of 5 per cent. per annum thereon until paid, and sustaining a writ of attachment issued in the case. The same judgment condemned the Black River Lumber Company, as garnishee, to pay plaintiff the above amount.

The Concordia Land & Timber Company was cited through a curator ad hoc and by posting copies of the petition, citation, and writ of attachment on the courthouse door. The Black River Lumber Company was served with legal process, as garnishee, by delivery of the same to its duly authorized agent. Service on both the defendant and garnishee was made on March 12, 1921. On May 4th of the same year, the defendant having failed to make any appearance in the case, a default, previously entered, was confirmed, and the above judgment rendered against it, and, on the same day, the garnishee having failed to answer the interrogatories propounded to it to ascertain whether it was indebted to plaintiff, and, if so, in what sum, the interrogatories were taken for confessed, and judgment was rendered against it, as above stated.

The garnishee has appealed from the judgment rendered, and has assigned as error in this court that the judgment is absolutely null and void both as against it and the Concordia Land & Timber Company, for the reason that from the allegations of plaintiff's petition it appears that the Concordia Land & Timber Company had been doing business in the state of Louisiana, and therefore no curator ad hoc could be appointed, and no service could be made on that company in the manner adopted by plaintiff, since section 26 of Act 267 of 1914 and Act 179 of 1918 have repealed all laws permitting the service of process on a foreign corporation through a curator ad hoc.

The assignment further sets forth as error that the judge below failed to take judicial notice that the Concordia Land & Timber Company had appointed an agent to receive service of process, and to notice that the appointment had not been revoked. It is alleged that he should have taken such notice, and this court is urged to do so.

The assignment concludes by averring that, as the judgment against the Concordia Land & Timber Company is an absolute nullity, on the face of the record, the judgment against the appellant and garnishee, the Black River Lumber Company, is also null, and must fall with it.

The judgment against the Concordia Land & Timber Company is one in rem, and is based on promissory notes, signed as maker by the Jeffries Lumber Company, payable to the order of plaintiff, the National Park Bank, of New York. The notes were indorsed by the Concordia Land & Timber Company, and were dated at Jeffries, La. The order of court appointing the curator ad hoc, and granting the writ of attachment, upon which the garnishment is based, was issued on the following allegations, duly sworn to, and found in plaintiff's petition, to wit:

"Said Concordia Land & Timber Company is absent from and not represented in the state of Louisiana, and has already left the state permanently, or is about leaving permanently the

state without there being a possibility, in the ordinary course of judicial proceedings, of obtaining or executing judgment against it previous to its departure."

[1, 2] While the question, as to the right of the garnishee to urge the nullity of the judgment against the defendant does not appear to be raised, yet it may be said, in reference to such a right that, if the law did not authorize the proceeding in rem, as conducted by plaintiff, then it follows, as a matter of course, that the judgment rendered against the defendant is absolutely null and void. Since the garnishee has been condemned to pay that judgment and since it is manifest that a garnishee should not be called upon to pay a judgment that is absolutely null and void, the right exists in the garnishee to attack the judgment on that ground. As the demand against the garnishee is purely ancillary to that against the defendant, if the judgment based on the latter should fall, the judgment against the garnishee should fall with it. To hold otherwise would be to hold, in effect, that a garnishee may be required to pay an alleged debt against another before it is proved, since a debt cannot be proved, from a legal standpoint, until the debtor has been cited, or has waived citation. In fact, it is held in other jurisdictions, and the same should be true here, that, if the judgment against the defendant is not merely irregular, but is null and void, payment by the garnishee will not protect him in a suit by the defendant to recover on the debt garnisheed. 20 Cyc. pp. 1146 and 1148. Therefore it will be necessary to inquire into the validity of the judgment against the defendant, on the ground mentioned.

Unless repealed, in so far as respects foreign corporations that have done business in the state, and have permanently withdrawn therefrom, leaving no agent to receive service of process, the law governing procedure in rem, where a writ of attachment issues, in so far as relates to the service of process, and the appointment of curators ad hoc, is as follows:

"If, on the contrary, the defendant has no known place of residence, conceal his person, be absent or reside out of the state, in such case the sheriff shall serve the attachment and citation by affixing copies of the same on the door of the room where the court in which the suit is pending is held." C. P. art. 254.

"In the latter case, the sheriff must keep the copy of the petition, in order to deliver the same to such party, should he appear, or to the advocate appointed to defend him, in his absence." C. P. art. 255.

[3] It will be seen from the above that, in proceedings in rem, where attachments issue, the defendant is cited by posting a copy of the citation and attachment on the courthouse door, and that the copy of the petition alone, is delivered to the curator ad hoc, or advocate, should the absentee fail to appear to receive it. Walker v. Barelli, 32 La. Ann. 467. In all other than attachment suits, or in most of them, the copy of the petition and of the citation is served on the defendant by delivery to the curator ad hoc. C. P. arts. 195, 294, 737; Morris v. Bienvenu, 30 La. Ann. 878.

[4] In the case at bar, assuming that such procedure has not been altered or abolished, in respect to foreign corporations, it may be said that the sheriff has sufficiently complied with the law, in so far as relates to the service of process. While he posted the copy of the petition on the courthouse door, instead of retaining the copy, yet that was harmless, since he could have gotten it from there as well as from any other place, to deliver it to the defendant had he appeared.

To continue with the method of procedure provided for proceedings in rem, when attachments issue, article 260 of the Code of Practice provides for the appointment of an advocate, or curator ad hoc, to represent the defendant, and reads as follows:

"If, on the contrary, the party fail to appear either in person or by his attorney, the court

shall appoint an advocate to represent him and defend the suit, and a reasonable delay shall be given to such advocate to enable him to communicate with the party he represents, in order to obtain the information necessary to defend the suit."

See, also, Code of Practice, art. 116, and Act 219 of 1918.

[5, 6] The above constitutes the procedure, in so far as respects the service of process and the authority to appoint a curator ad hoc, which the garnishee, as we appreciate the issue, contends has been repealed by Act 267 of 1914, in so far as relates to foreign corporations that have engaged in business in the state, and have afterwards withdrawn permanently, without leaving an agent upon whom process might be served. Let us examine Act 267, which is the corporation act, to ascertain whether there has been such a repeal. Section 26 thereof is the only section that provides for the service of process on foreign corporations, and reads as follows:

"That service of all legal process on any foreign corporation subject to the provision of this act shall be made as follows:

"(a) On any agent, or agents, which the corporation may have designated, in accordance with existing laws, as agent, or agents, for service or process. This service may be made wherever the agent, or agents, may be found;

"(b) If the agent, or agents, mentioned in paragraph (a) of this section, cannot be found, then service may be made upon any regularly employed agent or employee of the corporation, over eighteen years old, in any office which the corporation may have established and maintains in this state;

"(c) If the corporation, being one required by law to appoint and maintain an agent for the service of process, has failed so to do, or such agent, if appointed, cannot be found, and said corporation has not established and maintained an office in the state, the officer charged with the duty of making the service, shall, after diligent effort, make return to the court, stating the efforts made by him to secure service, and the reasons for his failure so to do, and thereafter, the judge, or in the event of his absence from the parish, the clerk, shall order service to be made on the secretary of state, whose duty it shall be forthwith, to send, by registered mail, addressed to the corporation at its last-known domiciliary post office address, the originals of the papers served on them, retaining in his office true copies thereof, upon which he shall note the date, the manner and other particulars of the service, and of the disposition of the originals."

No conflict arises between the service required in subsections "a" and "b" of the above-quoted provision and the procedure indicated above for proceedings in rem, and followed in this case, for the reason that those subsections were manifestly intended to provide for the service of process in proceedings in personam, and therefore relate to an entirely different phase of the subject-matter. It might be said, however, and we understand it to be so urged, that there is a conflict between the procedure in rem, as provided in the Code of Practice, in respect to service of process, and subsection "c" of the above-quoted provision, in that by the latter the service on foreign corporations must be on the secretary of state, under the conditions named in said subsection. If this provision has reference to proceedings in rem, then there is a conflict; but we do not think it was the legislative intention to make it applicable to such proceedings. It will be observed that in subsection "c" service is permitted on the secretary of state only on foreign corporations that are required to appoint and maintain agents in the state for the service of process. The only foreign corporations required to appoint such agents, under the laws providing therefor, are those doing business in the state. The law nowhere requires such corporations to maintain agents for such purpose after they have withdrawn permanently, except probably insurance companies, and then only for service of process as to causes of action which arose while such companies were transacting business in the state. Hence, under the terms of subsection "c" itself, no service can be made on the secretary of state, after such withdrawal, whether it be for

the purpose of obtaining judgment in personam or in rem.

However, before concluding that Act 267 of 1914 has not effected the repeal contended for, it is necessary to examine the repealing clause of that act. That clause specifically repeals numerous acts of the General Assembly and sections of the Revised Statutes, but none on the subject of proceedings in rem, or relative to the appointment of curators ad hoc. It makes the act supersede all provisions conflicting with it found in the Civil Code or Code of Practice, but does not repeal those provisions. However, as there is no conflict between the act and the proceedings in rem, provided by the Code of Practice, relative to the service of process, and the appointment of curators ad hoc, the act did not supersede those articles, and, as a matter of course, for the same reason, no repeal took place.

In 1918 the Legislature enacted Act 179 of that year, which is an act regulating the bringing of certain suits, and the service of civil process, and in providing for service on foreign corporations, carried verbatim into the act of 1918 subsections "a," "b," and "c" of Act 267 of 1914, quoted above, and those provisions, as re-enacted in 1918, were in force at the time this suit was instituted, and are still in force. In section 3 of the act of 1918, it is enacted, to quote the section:

"That nothing herein contained shall be held to impair or effect [sic] proceedings by attachment or proceedings in rem as now authorized by law, but, as far as applicable, any of the proceedings, and modes of service herein provided for may be used in such cases."

By this provision it will be observed that proceedings in rem, authorized by law at the time of the adoption of the act, which include those used in this case, are expressly preserved. Hence no repeal resulted.

[7] We therefore conclude that, under the allegations of plaintiff's petition, and under the law, the court had power to appoint a curator ad hoc to represent defendant and to defend the suit, and that service was properly made on the defendant by posting. The allegation that defendant was permanently absent, and was not represented here, authorized the appointment, and the service of process by posting on the courthouse door. It is true that the petition also alleges that the defendant is about to leave the state permanently, without there being a possibility, in the ordinary course of judicial proceedings, of obtaining or executing judgment against it. This is one of the grounds specified by article 240 of the Code of Practice for the issuance of a writ of attachment, as is also the ground of permanent absence, the latter being, in addition, as stated, a ground for the appointment of a curator ad hoc.

The allegation that the defendant was about to leave the state permanently did not deprive the court of jurisdiction to appoint a curator ad hoc, under the allegation of permanent absence. It is permissible, in attachment proceedings, to allege the various grounds for the issuance of the writ, substantially as set forth in the Code of Practice, and to prove one of them on the trial. Coleman & Sharpe v. Teddlie and Nugent, 106 La. 192, 30 South. 99.

[8] As the evidence offered, on the confirmation of the default, was not reduced to writing, we presume from the fact that the court rendered judgment on constructive service that the allegation of permanent absence was proved, for otherwise the judgment could not have been rendered legally.

[9, 10] The garnishee also urges that the court below should have taken judicial cognizance of the fact, asserted by it, that, at the time this suit was instituted, there was on file, and not revoked, in the clerk's office of Concordia parish, and in the office of the secretary of state, the appointment by defendant of an agent to represent it, upon whom service of process might have been

made, and it urges this court to take such notice. While doubtless there are documents in the office of the secretary of state, and perhaps in the office of a clerk of court, outside of the record, that the courts may notice judicially, yet we think that it would be carrying the doctrine of judicial cognizance too far to take judicial notice of the appointment of agents, and of the revocation of such appointments, by foreign corporations. It is true that subsection "e" of section 1 of Act 179 of 1918 requires the secretary of state to send annually to the sheriffs and clerks of court a certified list of all foreign corporations that have appointed agents in the state, together with the names and domiciles of such agents, but the purpose of this provision is not to require the courts to take judicial cognizance of the contents of such lists. As stated, in the subsection, the purpose is to facilitate service of process on such corporations. The lists are for public inspection; and it may be added that the only absolute assurance the law gives to litigants, or could give them, who use the lists, is that service of process, made according to them, will interrupt prescription. It may be added, though it is unnecessary, that, if a foreign corporation should be proceeded against in rem, by the appointment of a curator ad hoc, when it was maintaining an agent authorized to receive service of process, it has adequate remedy to annul the judgment by direct action.

[11] The garnishee also contends that we have decided that defendant has appointed an agent to receive service of process in two cases, which it mentions; that we should take notice of the facts found by us in those cases; that, having found in those cases that defendant once appointed an agent, we should take judicial cognizance of that fact, and should presume that the agency continues, until the contrary is shown, or until a different presumption arises from the nature of the subject under consideration.

In Mower v. Kemp, 42 La. Ann. 1015, 8 South. 830, this court took judicial cognizance of the fact that, in a decision rendered by it, in another case, a certain mortgage had been duly authorized. In order to reach that conclusion it was necessary to find that the Legislature had passed an act authorizing the execution of the mortgage. The act was a private one, passed in the interest of a private corporation. The court said:

"While it may be true, as a general proposition, that the act of the Legislature authorizing the execution of this act of mortgage, being a private act, should have been introduced in evidence, yet that it was not can make no difference, as we are bound to take judicial cognizance of our own decisions, and by the terms of the decision just quoted [Vicksburg, Shreveport & Pacific Railroad Company v. Sledge, 41 La. Ann. 869] we are informed that the mortgage was duly authorized and executed [41 La. Ann. 1007]."

Without the least disposition to criticize this ruling, it may be said that it is not applicable here. It may be assumed that, in the two cases referred to by the garnishee, this court decided that the defendant had an agent in the state. In one of them, Concordia Land & Timber Company v. Conn (No. 19013), which involved the question of agency, a writ of review was refused, on the face of the record, to review an opinion of the Court of Appeal. This was in September, 1911, some 9 years before this suit was filed. The other case is that of the Fifth Levee District v. Concordia Land & Timber Co. reported in 141 La. 247, 74 South. 921, and decided about 4 years before this suit was instituted. Assuming, therefore, that we held that an agency existed 4 years before the present suit was instituted, we cannot presume that it still existed at the time this suit was filed, in the face of the plaintiff's petition, alleging that the defendant was permanently absent from the state, and had left it, and was not represented therein, and in the face of the presumption of verity, arising from a judgment rendered on a record, regular on its

face, of which that petition forms part, and is the basis. The record being regular, the presumption of verity overcomes the presumption that the agency continued to exist up to the time of the institution of this suit.

Therefore, finding no error in the record, the judgment appealed from in the case of National Park Bank v. Concordia Land & Timber Company, in which the Black River Lumber Company is garnishee, will be affirmed.

In the case of Black River Lumber Company v. National Park Bank, the judgment against the garnishee, above affirmed, is attacked by the garnishee in a direct action to annul it.

The Black River Lumber Company alleges, in its suit to annul, that it is not indebted to the Concordia Land & Timber Company in any sum whatever; that, while the interrogatories on facts and articles, addressed to it, to ascertain whether it was indebted to the Concordia Land & Timber Company, were served on it, by delivery to its agent, in this state, on March 12, 1921, yet they were not received by its president, to whom they were forwarded by the agent, until March 28, 1921, due to the latter's absence from home; that the president of the company then forwarded them to the company's attorney, in Chicago; that the attorney for the company requested Mr. Bullis, the attorney for the National Park Bank, to grant 30 days from March 28, 1921, in which to answer the interrogatories; that no response was received, and the request was therefore repeated on April 13th; and, as no reply was received, that, on April 27, 1921, a telegram was sent by the attorney for the plaintiff to Mr. Murch, one of its representatives in this state, requesting him to see Mr. Bullis, and arrange an extension; that a reply was received that Mr. Bullis was not at home, but would be seen later; that on May 3d another telegram

was sent Murch to see Bullis; that to this telegram a reply was sent by Murch on the afternoon of May 3d, and was received on the morning of the 4th, to the effect that Mr. Bullis did not feel like granting an extension, but would leave the question of taking judgment to the National Park Bank for determination; that, notwithstanding this statement from Bullis, he, as attorney for the National Park Bank, on the same morning that the telegram that was sent by Murch was received, had the interrogatories taken for confessed, and had judgment entered and signed.

The evidence shows that requests for an extension of time within which to answer the interrogatories were made as alleged, and that no replies were received. Mr. Bullis explains his failure to reply by testifying that business affairs prevented his doing so. The evidence shows that plaintiff's representative sent the telegram of May 3d, to the effect that Bullis would leave the matter to his client as to whether an extension should be granted. The evidence, however, is conflicting as to whether Bullis made such a statement relative to the extension. The representative of the Black River Lumber Company testifies that he did. Mr. Bullis testifies that in the conversation which followed the request of Murch for time he (Bullis) stated that he had doubts as to whether the Black River Lumber Company owed the Concordia Land & Timber Company the full amount of the claim of the National Park Bank, and would submit to that bank the question as to whether it would take the money, but at no time consented to an extension, or stated that he would submit that question to the bank. He testifies very positively that he stated to Murch, as the latter left, to tell the attorney for the company that no extension would be granted. The evidence of Bullis is corroborated substantially by that of his stenographer, and especially as to what was

said as Murch left. The evidence preponderates in favor of the contention that Bullis at no time stated he would submit to the bank the question as to whether an extension should be granted.

The burden of proof was on the Black River Lumber Company to establish the agreement, alleged in its petition, that Bullis consented to submit the question of extension of time to the bank; and, as it failed to carry the burden, it has failed in this part of the case.

The Black River Lumber Company, however, urges that should we hold, as we have, then, notwithstanding, the judgment should be annulled for the reason that Murch had been misled into believing that the question of extension would be left to the bank. The witnesses, who have testified as to what was said relative to the extension, are of good repute. Murch hardly would have sent the telegram he did to his principal had he not believed that its contents reflected the truth. On the other hand, Bullis hardly would have taken judgment against the Black River Lumber Company on the morning after the conversation without submitting the question to the bank, and without waiting for a reply, and advising the Black River Lumber Company of the answer, had he promised to submit the question. However, the statement of Bullis to Murch, as the latter left, to tell the attorney for the Black River Lumber Company that no time would be granted, is so clear and well established that any misunderstanding that arose could have been due only to carelessness and inadvertence. Under the circumstances, we would not be warranted in annulling the judgment.

The Black River Lumber Company, as it was necessary for it to do in an action of this nature, has set forth in its petition that it had defenses to make in the garnishment proceeding against it. Those defenses were as follows: That it was not indebted to the Concordia Land & Timber Company, and, if it were, that prescription had run against the debt, and, if not, that it has a demand to plead in compensation against it; and, lastly, that the debt was not subject to garnishment. It is, however, unnecessary to pass on those defenses, as we have found that there does not exist sufficient ground to annul the judgment. While in a suit of this nature, the plaintiff should show that he has defenses to make to the demand upon which the judgment was rendered, yet the fact that he has such defenses is not of itself sufficient to annul the judgment.

In respect to the last defense stated, it may be said, however, that the first interrogatory propounded sought to elicit whether the Black River Lumber Company was indebted to the Concordia Land & Timber Company, and, if so, whether in a sum sufficient to pay the demand of the National Park Bank against the latter company. A failure to answer that interrogatory within the time prescribed by law, no extension having been granted, authorized that the interrogatory be taken for confessed, and authorized the judgment rendered against the Black River Lumber Company. C. P. art. 263.

When the suit to annul was filed, the Black River Lumber Company sued out a writ of injunction, enjoining the execution of the judgment against it. The court below allowed the National Park Bank, for the wrongful issuance of the writ, damages, under article 304 of the Code of Practice, amounting approximately to 4 per cent. of the amount of the judgment enjoined. The National Park Bank, in its answer to the appeal, has asked that these damages be increased. We see no sufficient reason to increase them.

For the reasons assigned, it is ordered, adjudged, and decreed that the judgments appealed from, in both of these consolidated cases, be, and the same are hereby, affirmed; the appellant to pay the costs.

## On Rehearing.

ST. PAUL, J. In the case first named plaintiff took judgment by default against defendant for $56,517.04 as in rem upon an attachment against an absent and unrepresented defendant, and service was made upon a curator ad hoc. The Black River Lumber Company was made garnishee, and, having failed to answer the interrogatories within the time prescribed by law, judgment went against it for the full amount of the claim against defendant.

From this judgment the garnishee appealed, alleging that the judgment against the defendant was a nullity, and consequently the judgment against the garnishee fell with it; the alleged ground of nullity being that the defendant was not unrepresented, but on the contrary had an agent within the state on whom process could be served.

Since the rendition of first judgment herein, the Concordia Land & Timber Company has appeared in this court admitting the claim of the plaintiff against it and praying that the judgment be affirmed.

[12, 13] This disposes of the judgment against the Concordia Land & Timber Company, since the garnishee has no other interest in that judgment than to see that it is protected in its payment (if any it owes) by a valid judgment against the defendant. See Hanna's Syndics v. Lauring, 10 Mart. (O. S.) 568, 13 Am. Dec. 339; Kimball v. Plant, 14 La. 511.

The garnishee must therefore confine itself to such issues as concern it directly, and these are set up in an action to annul the judgment against itself under the title herein above secondly set forth, in which it appeals from a judgment dismissing its demand.

## I.

[14] The ground on which the garnishee seeks to annul the judgment against it is that it was misled by counsel for the bank into delaying its answer to the interrogatories, and that it owes the defendant nothing.

Briefly stated, the facts are these: The garnishee, a nonresident corporation, was served with the interrogatories through its resident agent on March 12, 1921; the agent sent the interrogatories to the president of the company at Madison, Wis.; the latter was absent and did not receive them until March 25th, being more than 10 days after service. He sent them at once to the company's attorney at Chicago, who wrote to the attorney for plaintiff on March 28th, and again on April 13th, asking for a delay of 30 days from March 28th in which to answer. To these letters he received no answer, and April 27th he telegraphed his local manager to see the attorney and arrange for the delay. The attorney was out of town that day, but the manager met him casually on April 30th, when he stated that he was unwilling to grant any further delay, but would see him later. By some misunderstanding the parties did not meet again that day; but on May 3d the manager received another telegram from the attorney and on that day saw the attorney.

It may be observed here that up to this time the attorney might have taken judgment against the garnishee at any time, but in point of fact he had not done so.

It is at this interview of May 3d that the garnishee's manager claims to have been misled. As to this interview Mr. Murch, the manager, testified:

"He (Mr. Bullis, the attorney) said that 30 or 40 days had elapsed since the time specified in which to file answer, and there was not a thing in the world to stop him from taking judgment. He said it was a case which had given him a good deal of thought and worry, and he had talked it over with the young lady there, who was present at that time, I think his stenographer, and he jokingly remarked: 'Suppose we leave it to her.' Mr. Bullis said, calling her by name: 'What will we do?' She said: 'I don't think it would be right to take

judgment.' Mr. Bullis said: 'Mr. Murch, what would you do if you were in my place; there is between $20,000 and $30,000 fee for me in this case if I collect it.' I told him not to ask me what I would do; if he asked me what the Black River Lumber Company would do, I would answer that they would certainly grant the extension. He said he had no right to grant an extension; that he had been engaged by the National Park Bank to collect this money, and he did not see that he had any right to do anything but go ahead and take judgment. I told him, if he felt that way, why not leave it up to the National Park Bank. Mr. Bullis said: 'I have decided to do that.' Then I said, 'I will wire my people that he is going to leave this up to the National Park Bank whether an extension is granted or not;' and he said, 'Yes.' * * * If Mr. Bullis hadn't told me he was going to leave it up to the National Park Bank to decide, I would at once have called on a local attorney and had him file some sort of an answer to protect our rights in the matter, so that it wouldn't go by default."

And within an hour afterwards Murch telegraphed his attorney at Chicago:

"Bullis does not feel like granting extension. Papers all ready to take judgment; has agreed to leave it up to National Park Bank whether he shall do so or not."

Miss Corinne Wade, stenographer and secretary to Mr. Bullis, testified as follows:

"Well, Mr. Bullis said: 'I leave it to my secretary.' And I said it would be very cruel. * * * Question: Before he left the office did not Mr. Bullis say that he would leave it to the National Park Bank? Answer: No; he said this, before he would leave anything to them, he said: 'What would you do if you were in my place?' Mr. Murch said: 'My company would not take money like that.' And Mr. Bullis just laughed, and I laughed, and Mr. Bullis said: 'Well, I will leave it to my company.' * * * He was talking about the money; he was not talking about the judgment. * * * Mr. Murch said: 'My company would not take the money like this.' And Mr. Bullis said: 'Well, I will leave it up to my company whether they will take it.'"

The witness further testified that, as Mr. Murch left the office, Mr. Bullis followed him to the door and said to him, "Tell those Chicago attorneys that I won't give them any extension at all."

Mr. Bullis, attorney for plaintiff, testified:

"* * * He then repeated his statement that his Chicago attorney had instructed him to see me regarding an extension of time to answer the interrogatories, and we had quite a little discussion of the matter. In the course of the conversation I stated that I had been greatly troubled by my ethical position in the matter, because I thought the Black River Lumber Company owed the Concordia Land & Timber Company considerable, but didn't think that they owed the full amount of the debt of the National Park Bank, which I was suing for, and I hadn't been quite clear as to whether it was ethical to take the money under those circumstances. I had asked Mr. Murch what he would do, and he stated that that was not a fair question, because he was an officer and stockholder of the Black River Lumber Company, but he stated to me that his company would not take money under such circumstances. I rather jokingly replied that I did not know whether my company would take the money or not. Mr. Murch then stated that I should let my company say whether they would or not. I told him that I thought that was right, and that I would do that. I told him that I didn't see any reason why I should be bothering my head whether to take money which the law allowed, and I would let my client say whether they would take the money or not. All of this had reference to my possible ethical position in the matter. * * * There was no thought in my mind whatever that I was making any agreement regarding this case, or that Mr. Murch was asking me to make any agreement along the lines we had discussed; the discussion being solely as to my possible position. When Mr. Murch asked me what he should telegraph his Chicago attorneys, I told him: 'Tell your Chicago attorneys that I will not grant any delay whatever in taking judgment.' I had opened the door for Mr. Murch, and was standing with my hand on the knob of the door, and Mr. Murch had already passed out, but was standing within five feet of me. Mr. Murch made some noncommittal reply, or I am not sure that he made any reply at all, and went on; and I have had no further discussion with him since then."

On rebuttal Mr. Murch said:

"I went there to get an extension of time in which to answer the interrogatories. * * * After I got all through, Mr. Bullis told me that he would leave it up to the National Park Bank and let them decide. And I said, 'I will so wire my people,' and he said, 'Yes.' That was

the last thing that transpired in Mr. Bullis' office."

## II.

As the district judge says in his opinion that the witnesses are all "presumably of equal credibility," and he has no abiding conviction that Murch did not testify truthfully or that Bullis and Miss Wade testified falsely, we have no reason to doubt that Mr. Bullis did make the remark as Mr. Murch was leaving the door, "Tell your Chicago attorneys that I will not grant any delay in taking judgment," or, "Tell those Chicago attorneys that I won't give them any extension at all."

On the other hand, we are bound to believe either that Murch did not hear the remark, or that the hearing of it did not produce any impression on his mind different from that which he already had, and which he communicated at once to his attorney, to wit, that, whilst Bullis himself would grant no extension, yet he would leave it to the Park Bank to decide. For that remark was only emphasizing what had already been said about Bullis' unwillingness to grant any extension on his own behalf, and contained nothing whatever to indicate that Bullis no longer intended to submit to the Park Bank for decision the matter which he had said he would refer to them, whatever that was. If Bullis intended to change his mind on that subject, he should have made it clear to Murch. But there is no pretense whatever that Bullis did change his mind in that respect, for his position was then, and is now, that the question which he intended to submit to the bank was, not whether an extension could be granted in which to file answers, but whether the bank would take the money after he had taken judgment against the garnishee.

## III.

So that the question ultimately resolves itself into this, whether Murch mistook Bullis' meaning through mere carelessness and inadvertence, or had reasonable grounds for believing that the question of extending the time for answering would be submitted to the Park Bank.

Now it will be remembered that Murch had no purpose in going to Bullis, except to obtain an extension of time in which to answer. And to Murch, a layman, the difference between taking judgment, and taking the money after judgment could not have been very clear or very important. Nor could any such difference have been very clear or very important to the lady stenographer when the matter was submitted (jocularly) to her, and when she replied that "it would be very cruel." For the last question and answer on her direct examination were as follows:

"Do you know of any conversation that took place regarding taking money under the judgment, or anything of that sort? Answer: You mean while Mr. Murch was there. I don't know anything about money while I was there."

So that to Miss Wade, who doubtless did not mean to contradict herself, taking the money and taking the judgment meant much the same thing.

Nor does Mr. Bullis in his own testimony say that he made it clear that he intended first to take judgment and then submit to his client the question whether they would take the money. He simply said that he thought it was right to submit to his client the question whether they would take the money.

But we have quoted the testimony quite fully, and we feel that Mr. Murch was not acting carelessly and might reasonably have been led to believe from what occurred that the question which Mr. Bullis meant to submit to the bank was whether or not the garnishee would be granted an extension of time in which to answer; this notwithstanding that Bullis had in mind to submit to the bank only the question whether it

would take the money realized on the judgment.

## IV.

On receipt of the telegram sent by Murch, as aforesaid, on May 3d, the attorneys for the garnishee communicated at once with the bank, and the latter telegraphed Bullis on May 4th to extend time to answer until May 31st provided it did not prejudice plaintiff's rights. To which Bullis replied on the same day that he had already taken judgment, but could annul it and grant a new trial if so instructed by the bank. On the next day the bank wired not to cancel the judgment, but merely refrain from pressing for payment until further advised.

But no further action appears to have been taken, and this suit to annul the judgment followed.

## V.

We are of opinion that under the circumstances stated Mr. Murch was misled, not by any carelessness or inadvertence on his own part, but by the failure of the attorney for the bank to make clear his intention to take judgment at once and submit to his client only the question of whether the latter would take the money realized on the judgment thus taken. Had this been made clear to Murch, he still had the opportunity to answer (Proseus v. Mason, 12 La. 16), and this opportunity was lost when he relied upon the question of an extension of time being submitted to the bank.

## VI.

[15] For the rest the garnishee shows that it is not without a defense with some appearance, at least, of merit against any claim which the Concordia Land Company may have against it, and which it should have an opportunity to present in the proper way.

On the other hand, those issues cannot be passed upon in this action of nullity. In the first place, no such prayer is contained in the petition, which asks only that the judgment be set aside and the garnishee be given an opportunity to answer. In the next place, the judgment against the garnishee must stand until set aside, and hence the correctness thereof cannot be inquired into in the same proceeding in which the nullity thereof is urged. To do so would be to cumulate in one and the same proceeding an action to annul the judgment with an action to review the correctness thereof in a method unknown to the law, and before a tribunal not authorized to review the correctness of its own final judgments. The examination into the merits of a final judgment cannot be had until that judgment be set aside.

### Decree.

It is therefore ordered that the judgments appealed from be so amended that the judgment in favor of the National Park Bank and against the Concordia Land & Timber Company be affirmed; and that the judgment in favor of the National Park Bank against the Black River Lumber Company, garnishee, be annulled, avoided, and set aside.

It is further ordered that the Black River Lumber Company be given 10 days from the filing of this decree in the court below in which to answer the interrogatories propounded to it as garnishee; that the National Park Bank pay the costs of both courts in the matter of Black River Lumber Co. v. National Park Bank; and that the Concordia Land & Timber Company pay the costs of both courts in the matter of National Park Bank v. Concordia Land & Timber Company.